Case 2:21-cv-03306-BMC Document 1-3 Filed 06/11/21 Page 1 of 39 PageID #: 26

**SUPREME COURT FOR THE STATE OF NEW YORK**
**COUNTY OF SUFFOLK**

---

TOWN OF ISLIP, NEW YORK,

                    Plaintiff,

      -against-

3M COMPANY (f/k/a MINNESOTA MINING AND MANUFACTURING CO.), TYCO FIRE PRODUCTS L.P. Successor-In-Interest to the ANSUL COMPANY, BUCKEYE FIRE EQUIPMENT COMPANY, CHEMGUARD, INC., RAYTHEON TECHNOLOGIES CORPORATION (f/k/a United Technologies Corporation), KIDDE-FENWAL, INC., CARRIER GLOBAL CORPORATION, DYNEON LLC, AMEREX CORPORATION, NATIONAL FOAM, INC., E.I. DU PONT DE NEMOURS AND COMPANY, THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, BASF CORPORATION, DYNAX CORPORATION, CLARIANT CORPORATION, ARCHROMA U.S., INC., ARKEMA INC., DAIKIN AMERICA, INC., CHEMDESIGN PRODUCTS INC., DEEPWATER CHEMICALS, INC., JOHN DOE "1" THROUGH "100", JANE DOE "1" THROUGH "100", JOHN DOE CORPORATIONS "1" THROUGH "100", and OTHER JOHN DOE ENTITIES "1" THROUGH "100",

                    Defendants.

---

Index No.:

**<u>SUMMONS</u>**

Plaintiff designates Suffolk County as the Place for Trial.

The Basis of Venue is Plaintiff's Place of Business: 655 Main Street Islip, NY 11751

Date Index Number Purchased: May 10, 2021

TO THE ABOVE NAMED DEFENDANTS:

      You are hereby summoned and required to serve upon the Plaintiff's attorneys an answer to the complaint in this action within twenty (20) days after the service of this summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the complaint.

1

Dated:  May 10, 2021
        Melville, New York

**RIGANO LLC**
*Attorneys for Town of Islip, New York*

By: */s/ Nicholas C. Rigano*
    James P. Rigano, Esq.
    Nicholas C. Rigano, Esq.
    538 Broad Hollow Road, Suite 301
    Melville, New York 11747
    (631) 756-5900

To:

3M Company (f/k/a Minnesota Mining And Manufacturing Co.)
3M Center
St. Paul, Minnesota 55144

Tyco Fire Products L.P. Successor-In-Interest to the Ansul Company
1400 Pennbrook Parkway
Lansdale, Pennsylvania 19446

Buckeye Fire Equipment Company
110 Kings Road
Kings Mountain, North Carolina 28086

Chemguard, Inc.
One Stanton Street
Marinette, WI 54143

Raytheon Technologies Corp. (f/k/a United Technologies Corporation)
10 Farm Springs Road
Farmington, Connecticut 06032

Kidde-Fenwal, Inc.
400 Main St.
Ashland, Massachusetts 01721

Carrier Global Corporation
13995 Pasteur Boulevard
Palm Beach Gardens, Florida 33418

Dyneon LLC
6744 33rd St. N.,
Oakdale, Minnesota 55128

2

Case 2:21-cv-03306-BMC   Document 1-3   Filed 06/11/21   Page 3 of 39 PageID #: 28

Amerex Corporation
7595 Gadsden Highway
Trussville, Alabama 35173

National Foam Inc.
141 Junny Road,
Angier, North Carolina 27501

E.I. du Pont de Nemours and Company
974 Centre Road
Wilmington, Delaware 19805

The Chemours Company
1007 Market Street
Wilmington, Delaware 19899

The Chemours Company FC, LLC
1007 Market Street
Wilmington, Delaware 19899

BASF Corporation
100 Park Avenue
Florham Park, New Jersey 07932

Dynax Corporation
103 Fairview Park Dr.
Elmsford, New York 10523

Clariant Corporation
4000 Monroe Road
Charlotte, North Carolina 28205

Archroma U.S., Inc.
543577 Center Drive, Suite 10
Charlotte, North Carolina 28217

Arkema Inc.
900 First Avenue
King of Prussia, PA 19406

Daikin America, Inc.
20 Olympic Drive
Orangeburg, New York 10962

3

Case 2:21-cv-03306-BMC   Document 1-3   Filed 06/11/21   Page 4 of 39 PageID #: 29

ChemDesign Products Inc.
2 Staton Street
Marinette, WI 54143

Deepwater Chemicals, Inc.
196122 East Country Road 40
Woodward, OK 73801

4

Case 2:21-cv-03306-BMC Document 1-3 Filed 06/11/21 Page 5 of 39 PageID #: 30

**SUPREME COURT FOR THE STATE OF NEW YORK**
**COUNTY OF SUFFOLK**

---

TOWN OF ISLIP, NEW YORK,

                       Plaintiff,

      -against-

3M COMPANY (f/k/a MINNESOTA MINING AND
MANUFACTURING CO.), TYCO FIRE PRODUCTS L.P.
Successor-In-Interest to the ANSUL COMPANY,
BUCKEYE FIRE EQUIPMENT COMPANY,
CHEMGUARD, INC., RAYTHEON TECHNOLOGIES
CORPORATION (f/k/a United Technologies Corporation),
KIDDE-FENWAL, INC., CARRIER GLOBAL
CORPORATION, DYNEON LLC, AMEREX
CORPORATION, NATIONAL FOAM, INC., E.I. DU
PONT DE NEMOURS AND COMPANY, THE
CHEMOURS COMPANY, THE CHEMOURS COMPANY
FC, LLC, BASF CORPORATION, DYNAX
CORPORATION, CLARIANT CORPORATION,
ARCHROMA U.S., INC., ARKEMA INC., DAIKIN
AMERICA, INC., CHEMDESIGN PRODUCTS INC.,
DEEPWATER CHEMICALS, INC., JOHN DOE "1"
THROUGH "100", JANE DOE "1" THROUGH "100",
JOHN DOE CORPORATIONS "1" THROUGH "100", and
OTHER JOHN DOE ENTITIES "1" THROUGH "100",

                     Defendants.

---

Index No.:

**COMPLAINT**

***Jury Trial Demanded***

Plaintiff designates Suffolk
County as the Place for Trial.

The Basis of Venue is
Plaintiff's Place of Business:
655 Main Street
Islip, NY 11751

---

Plaintiff Town of Islip, New York ("Plaintiff" or "Town") by and through its attorneys,

Rigano LLC, as and for its complaint against Defendants 3M Company (f/k/a Minnesota Mining

And Manufacturing Co.) ("3M"), Tyco Fire Products L.P. Successor-In-Interest to the Ansul

Company ("Tyco"), Buckeye Fire Equipment Company ("Buckeye"), Chemguard, Inc.

("Chemguard"), Raytheon Technologies Corporation (f/k/a United Technologies Corporation)

("United Technologies"), Kidde-Fenwal, Inc. ("Kidde"), Carrier Global Corporation ("Carrier"),

1

Case 2:21-cv-03306-BMC  Document 1-3  Filed 06/11/21  Page 6 of 39 PageID #: 31

Dyneon LLC ("Dyneon"), Amerex Corporation ("Amerex"), National Foam Inc. ("National

Foam" and together with 3M, Tyco, Buckeye, Chemguard, United Technologies, Kidde, Carrier,

Dyneon, Amerex, the "AFFF Manufacturing Defendants"), E.I. du Pont de Nemours and

Company ("DuPont"), The Chemours Company, The Chemours Company FC, LLC (together

with The Chemours Company, "Chemours"), BASF Corporation ("BASF"), Dynax Corporation

("Dynax"), Clariant Corporation ("Clariant"), Archroma U.S., Inc. ("Archroma"), Arkema Inc.

("Arkema"), Daikin America, Inc. ("Daikin"), ChemDesign Products Inc. ("ChemDesign"),

Deepwater Chemicals, Inc. ("Deepwater" and together with DuPont, Chemours, BASF, Dynax,

Clariant, Archroma, Arkema, Daikin, ChemDesign, the "Product Manufacturing Defendants" and

Product Manufacturing Defendants collectively with the AFFF Manufacturing Defendants, the

"Manufacturing Defendants"),  as well as John Doe "1" through "100", Jane Doe "1" through

"100", John Doe Corporations "1" through "100" and Other John Doe Entities "1" through "100"

(together, the "Unnamed Defendants" and collectively with the Manufacturing Defendants, the

"Defendants"), alleges as follows:

## Nature of the Action

1.      Plaintiff brings this action against Defendants for, among other things: (I) recovery

of the Plaintiff's past and future costs and damages in connection with investigating, treating, and

remediating contamination at and emanating from MacArthur Airport, which is owned and

operated by the Town and is located in Ronkonkoma, New York to eliminate contamination

caused and/or created by Defendants' actions or omissions, as well as protecting the public health,

safety, welfare, and the environment; (II) recovery of Plaintiff's damages associated with the

diminution of value of its property and other past and future damage; and (III) injunctive relief

requiring Defendants to remediate the contamination.

2

Case 2:21-cv-03306-BMC Document 1-3 Filed 06/11/21 Page 7 of 39 PageID #: 32

### Jurisdiction and Venue

2.      Subject matter jurisdiction is proper in this Court pursuant to New York State Constitution Article VI, § 7.

3.      Personal jurisdiction exists over each defendant pursuant to New York Civil Practice Law and Rules §§ 301, 302, 1501, New York Business Corporation Law § 1314 and other applicable law.

4.      Each of the Defendants are either registered to do business in the State of New York and/or have conducted substantial/regular business in the State of New York.  At all relevant times, Defendants manufactured, marketed, promoted, distributed, and/or sold: (i) aqueous film-forming foam ("AFFF") containing perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonate ("PFOS"), other per- and polyfluoroalkyl substances ("PFAS"), and/or their precursors, or (ii) PFOA, PFOS, other PFAS, their precursors or other feedstocks/ingredients containing them used in AFFF ("AFFF Components").  These products were used and stored at the Airport (located in New York) and caused or substantially contributed to contamination discussed below.

5.      Venue is proper in this Court because the actions/omissions of Defendants giving rise to the claims asserted herein occurred in Suffolk County, have caused harm to Plaintiff, which is a municipality located within Suffolk County, and/or all damages complained of herein occurred in Suffolk County.

### Parties

6.      Plaintiff Town of Islip, New York is a municipality located in Suffolk County New York.  All wrongs discussed herein occurred within Town's jurisdiction.

7.      Plaintiff owns and operates MacArthur Airport (the "Airport"), which is located in Ronkonkoma, New York and within Suffolk County.  The Airport's mailing address is 100 Arrival

3

Ave. Ronkonkoma, NY 11779.

8.      The Town also owns various real properties surrounding the Airport.

9.      Plaintiff has owned and operated the Airport since approximately 1960.

10.     The Airport is a public use Airport of approximately 1,311 acres.

11.     Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Co.) is a Delaware corporation registered and authorized to do business in New York, with a principal place of business at 3M Center, St. Paul, Minnesota 55144.

12.     Defendant Tyco Fire Products L.P., is a Delaware limited partnership registered and authorized to do business in New York, with a principal place of business at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446. Upon information and belief, Tyco is the successor-in-interest to Ansul, Inc.

13.     Defendant Buckeye Fire Equipment Company is an Ohio corporation, with a principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

14.     Defendant Chemguard, Inc. is a Texas corporation, with a principal place of business at 204 South 6th Avenue, Mansfield, Texas 76063 and/or One Stanton Street, Marinette, WI 54143.

15.     Defendant Raytheon Technologies Corp. (f/k/a United Technologies Corporation) is a Delaware corporation registered and authorized to do business in New York, with a principal place of business located at 10 Farm Springs Road, Farmington, Connecticut 06032.

16.     Defendant Kidde-Fenwal, Inc.is a Delaware corporation with its principal place of business at 400 Main St. Ashland, Massachusetts 01721.  Defendant Kidde-Fenwal, Inc. is the successor-in-interest to Kidde Fire Fighting, Inc. f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.

4

Case 2:21-cv-03306-BMC Document 1-3 Filed 06/11/21 Page 9 of 39 PageID #: 34

17.     Defendant Carrier Global Corporation is a Delaware corporation with a principal place of business of 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.  Carrier is the parent of Defendant Kidde.

18.     Defendant Dyneon LLC is a subsidiary of 3M and is a Delaware corporation.  It has a principal place of business of 6744 33rd St. N., Oakdale, Minnesota 55128.

19.     Defendant Amerex Corporation is an Alabama corporation with a principal place of business of 7595 Gadsden Highway, Trussville, Alabama 35173.

20.     Defendant National Foam, Inc. is a Delaware corporation, with a principal place of business at 141 Junny Road, Angier, North Carolina 27501.

21.     Defendant E.I. du Pont de Nemours and Company is a Delaware corporation with a principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and is authorized and registered to do business in New York.

22.     Defendant The Chemours Company is a Delaware corporation with a principal place of business of 1007 Market Street, Wilmington, Delaware 19899 and is registered and authorized to do business in New York.

23.     Defendant The Chemours Company FC, LLC is a Delaware corporation with a principal place of business of 1007 Market Street, Wilmington, Delaware 19899 and is registered and authorized to do business in New York.

24.     In or around 2015, Dupont "spun off" its fluorochemical business to Chemours. Upon information and belief, Chemours assumed certain environmental liabilities associated with DuPont's PFAS (including PFOA/PFOS) business.

5

Case 2:21-cv-03306-BMC   Document 1-3   Filed 06/11/21   Page 10 of 39 PageID #: 35

25.     Defendants Dupont and Chemours, among other things, supplied Defendant Chemguard and other AFFF Manufacturing Defendants with AFFF Components for use in AFFF that contributed to the contamination at issue and each is a substantial factor of Town's damages.

26.     Defendant BASF Corporation is a Delaware corporation with a principal place of business of 100 Park Avenue, Florham Park, New Jersey 07932 and is registered and authorized to do business in New York.  Among other things, BASF supplied Defendant Chemguard and other AFFF Manufacturing Defendants with AFFF Components for use in AFFF that contributed to the contamination at issue and is a substantial factor of Town's damages.

27.     Defendant Dynax Corporation is a Delaware corporation with a principal place of business of 103 Fairview Park Dr., Elmsford, New York 10523 and is registered and authorized to do business in New York.  Among other things, Dynax supplied Defendant Chemguard and other AFFF Manufacturing Defendants with AFFF Components for use in AFFF that contributed to the contamination at issue and is a substantial factor of Town's damages.

28.     Defendant Clariant Corporation is a New York corporation with a principal place of business of 4000 Monroe Road, Charlotte, North Carolina 28205 and is authorized and registered to do business in New York.  Among other things, Clariant supplied Defendant Chemguard and other AFFF Manufacturing Defendants with AFFF Components for use in AFFF that contributed to the contamination at issue and is a substantial factor of Town's damages.

29.     Defendant Archroma U.S., Inc. is a Delaware corporation with a principal place of business at 543577 Center Drive, Suite 10, Charlotte, North Carolina 28217.  Among other things, Archroma supplied Defendant Chemguard and other AFFF Manufacturing Defendants with AFFF Components for use in AFFF that contributed to the contamination at issue and is a substantial factor of Town's damages.

6

Case 2:21-cv-03306-BMC   Document 1-3   Filed 06/11/21   Page 11 of 39 PageID #: 36

30.     Defendant Arkema Inc. is a Pennsylvania corporation with a principal place of business at 900 First Avenue, King of Prussia, PA 19406.  Among other things, Arkema supplied Defendant Chemguard and other AFFF Manufacturing Defendants with AFFF Components for use in AFFF that contributed to the contamination at issue and is a substantial factor of Town's damages.

31.     Defendant Daikin America, Inc. is a Delaware corporation with a principal place of business at 20 Olympic Drive, Orangeburg, New York 10962.  Among other things, Daikin supplied Defendant Chemguard and other AFFF Manufacturing Defendants with AFFF Components for use in AFFF that contributed to the contamination at issue and is a substantial factor of Town's damages.

32.     Defendant ChemDesign Products Inc. is a Delaware corporation with a principal place of business located at 2 Staton Street, Marinette, WI 54143.  ChemDesign served as, among other things, a toll manufacturer for AFFF produced and distributed by Defendant Chemguard and other AFFF Manufacturing Defendants that contributed to the contamination at issue and is a substantial factor of Town's damages.

33.     Defendant Deepwater Chemicals, Inc. is a Delaware corporation with a principal place of business located at 196122 East Country Road 40, Woodward, OK 73801.  Deepwater served as, among other things, a toll manufacturer for AFFF produced and distributed by Defendant Chemguard and other AFFF Manufacturing Defendants that contributed to the contamination at issue and is a substantial factor of Town's damages.

34.     Each of the AFFF Manufacturing Defendants developed, manufactured, distributed, supplied, marketed and/or sold AFFF containing PFOA, PFOS, their precursors and other PFAS in New York and resulted in such AFFF being stored and used at and around the

7

Airport that contributed to the contamination at issue and is a substantial factor of Town's damages.

35.     Upon information and belief, AFFF Components developed, manufactured, distributed, marketed and sold by the Product Manufacturing Defendants were contained in the AFFF that caused the contamination at issue and each is a substantial factor of Town's damages.

36.     The Unnamed Defendants are those unknown individuals or entities who designed, developed, manufactured, distributed, marketed, supplied, and/or sold AFFF Components or AFFF at and around the Airport and, as such, contributed to and/or was a substantial factor in causing the contamination at issue.

## Factual Background

### I.     PFAS Overview

37.     PFAS are a family of hundreds of man-made chemicals comprised of primarily carbon and fluorine.

38.     PFAS chemicals were invented in the 1930's.

39.     PFAS chemicals are effective in products requiring fire extinguishment and repellency of water, oil, and stains.

40.     PFOA and PFOS are the two most widely studied PFAS chemicals.

### II.     Biopersistent, Bioaccumulative and Toxic Effects of PFOA and PFOS

41.     PFOA and PFOS are man-made chemicals that do not exist naturally.

42.     PFOA and PFOS are biopersistent.

43.     PFOA and PFOS can persist in the environment for decades.

44.     PFOA and PFOS do not easily degrade.

45.     PFOA and PFOS readily move through soil, sand and water.

8

46.     PFOA and PFOS are highly soluble in water.

47.     PFOA and PFOS bioaccumulate in humans, animals, and fish.

48.     PFOA and PFOS biomagnify in humans, animals, and fish.

49.     PFOA and PFOS can accumulate through the food chain.

50.     PFOA and PFOS may accumulate in humans in the serum, kidney and liver.

51.     PFOA and PFOS have a lengthy half-life within the human body.

52.     PFOA and PFOS have been found to cross the placenta wall from pregnant mother to fetus.

53.     PFOA and PFOS can be transferred from mother to infant via breastmilk.

54.     The United States Environmental Protection Agency ("EPA") has found that PFOA and PFOS may cause harm to developing fetuses and breastfed infants via transmission from the mother.

55.     PFOA and PFOS are toxic at very low levels.

56.     Human exposure to PFOA and PFOS has been linked to several diseases including testicular cancer, kidney cancer, thyroid disease, ulcerative colitis, hypertension and other conditions.

57.     The full health risk and impacts of exposure to PFOA and PFOS are still being studied.

58.     Injuries associated with PFOA and PFOS are typically latent and may manifest years or decades after exposure.

59.     Studies have shown that approximately 99% of Americans have detectable levels of PFOA and/or PFOS in their blood.

60.     Studies have shown that virtually every baby born in America is born with a

9

Case 2:21-cv-03306-BMC   Document 1-3   Filed 06/11/21   Page 14 of 39 PageID #: 39

detectible level of PFOA and/or PFOS in his/her blood.

61.     There is no background or naturally occurring level of PFOA and/or PFOS as the chemicals are not natural and are man-made.

62.     No human had PFAS in their blood prior to the chemicals being invented.

63.     PFAS substances, and particularly PFOA and PFOS, have been detected ubiquitously throughout the world including as far as the Arctic.

64.     Due to the foregoing, the manufacture, import and use of PFOA and PFOS are restricted in the United States.

65.     In 2009, the Stockholm Convention on Persistent Organic Pollutants restricted production and use of PFOS.  In 2019, the Stockholm Convention on Persistent Organic Pollutants added PFOA to the list of substances to be eliminated from production and use.

66.     In 2016, PFOA and PFOS were added to New York State's list of hazardous substances.

67.     In 2016, EPA established a drinking water health advisory of seventy (70) parts per trillion of combined PFOA/PFOS.

68.     Certain states have promulgated advisory exposure levels lower than seventy (70) parts per trillion.

69.     In August 2020, New York State adopted a binding maximum contaminant level ("MCL") of 10 ppt each for PFOA and PFOS (the "MCLs")

70.     A MCL is the maximum level of a contaminant allowed in public drinking water, which, once established, creates a legally enforceable standard that requires applicable water systems to monitor, report findings and keep the contaminant below the level set.

71.     The MCLs are two of the lowest MCLs adopted in New York for any contaminant,

10

Case 2:21-cv-03306-BMC Document 1-3 Filed 06/11/21 Page 15 of 39 PageID #: 40

evidencing the extraordinary toxicity of these compounds.

72.    In New York State, groundwater cleanup standards for a particular contaminant are set at the same level as an applicable MCL.

73.    In January 2021, the New York State Department of Environmental Conservation ("NYSDEC") published the revised *Sampling, Analysis, and Assessment of Per- and Polyfluoroalkyl Substances (PFAS)*.  In that document, NYSDEC:

a.    Stated that PFOA and PFOS should be further assessed and considered potential contaminants of concern in groundwater and surface water if PFOA or PFOS is detected in any groundwater or surface water sample at or above 10 ppt and is determined to be attributable to the site;

b.    Provides that further assessment of water (ground or surface) may be warranted if either of the following screening levels are met: where any individual PFAS (not PFOA or PFOS) is detected in water (ground or surface) at or above 100 ppt or total concentration of PFAS (including PFOA and PFOS) is detected in water at or above 500 ppt, further assessment of such water may be warranted;

c.    Adopted soil cleanup objectives for the protection of groundwater of 1.1 ppb and 3.7 ppb for PFOA and PFOS, respectively;

d.    If PFOA and/or PFOS are identified as contaminants of concern for a site, they should be assessed as part of the superfund remedy selection process.

74.    In June 2018, the United States Department of Health and Human Services Agency for Toxic Substances and Disease Registry issued a draft report for public comment titled Toxicological Profile for Perfluoroalkyls (the "ATSDR Report").

75.    The ATSDR Report calculated minimal risk levels for, among other chemicals, PFOA and PFOS.

76.    The minimal risk level is "an estimate of the amount of a chemical a person can eat, drink, or breathe each day without a detectable risk to health."

77.    According to the Association of State Drinking Water Administrators, the minimal

11

Case 2:21-cv-03306-BMC   Document 1-3   Filed 06/11/21   Page 16 of 39 PageID #: 41

risk levels for PFOA and PFOS found in the ATSDR report equate to approximately eleven (11) parts per trillion for PFOA and seven (7) parts per trillion for PFOS, which are materially consistent with the MCLs.

### III.   Environmental Impacts of PFOA/PFOS

78.     PFOA, PFOS and other PFAS contamination of environmental media (e.g. soil, groundwater, surface water, wildlife, and biota) is prevalent throughout the country.

79.     Airports are of particular concern for PFOA/PFOS and other PFAS contamination due to use and storage of AFFF at those facilities.

80.     Upon PFOA, PFOS or other PFAS coming into contact with soil, they migrate downward through the soil until they reach the groundwater.

81.     PFOA, PFOS and other PFAS readily dissolve into groundwater.

82.     With its natural movement, the groundwater flows and, if contaminated with PFOA, PFOS and/or other PFAS, the groundwater carries PFOA, PFOS and/or other PFAS spreading the contamination over a wide area.

83.     Groundwater contaminated with PFOA and PFOS is of particular concern where groundwater is used as drinking water.

84.     In 1978, EPA declared Suffolk County as a sole source aquifer meaning: (i) "[t]here are no reasonably available alternative drinking water sources should the aquifer become contaminated", and (ii) "if contaminated, [the aquifer] would create a significant hazard to public health."

85.     All drinking water supplied in the Town exclusively comes from the groundwater.

### IV.   Manufacturers of PFOA/PFOS and Their Apparent Decades-Long Knowledge and Intentional Concealment of Dangers To Human Health and the Environment

12

Case 2:21-cv-03306-BMC   Document 1-3   Filed 06/11/21   Page 17 of 39 PageID #: 42

86.     In the 1940's, 3M began manufacturing PFOA, PFOS and/or their precursors, as well as other PFAS.

87.     From no later than the 1950's through 2002, 3M was the primary manufacturer of PFOA and its precursors in the United States.

88.     From no later than the 1950's through 2002, 3M was the sole manufacturer of PFOS and its precursors in the United States.

89.     Upon information and belief, 3M made millions, if not billions, of dollars in profit from its production, distribution and sale of PFOA, PFOS and/or their precursors.

90.     Commencing in the 1950's, 3M began selling PFOA and/or its precursors to DuPont to enable DuPont to manufacture certain products, including products sold to AFFF Manufacturers to develop AFFF.

91.     Upon information and belief, 3M and Dupont made billions of dollars in profit from their products that contained PFOA, PFOS and/or their precursors, as well as other PFAS.

92.     As discussed fully below, 3M was the initial and primary manufacturer of AFFF, which for decades contained PFOA, PFOS, and/or their precursors, as well as other PFAS.

93.     Upon information and belief, by the end of the 1980's, certain Manufacturing Defendants, including, but not limited to, 3M and DuPont, were aware that PFAS materials, including PFOA and PFOS, had been detected in the blood of the general population of the United States, including people not known to be working at or living near facilities that manufacture PFAS suggesting that exposure resulted from use of products.

94.     By the end of the 1980's, certain Manufacturing Defendants, including but not limited to 3M and Dupont, conducted animal toxicity testing that indicated exposure to PFOA and/or PFOS resulted in various adverse health effects among multiple species of animals.

13

95.     Upon information and belief, those studies showed that exposure to PFOA and/or PFOS may cause a variety of cancers, birth defects and/or other illness.

96.     Upon information and belief, by the end of the 1980's, DuPont classified PFOA as a confirmed animal carcinogen and possible human carcinogen.

97.     By the end of the 1980's, certain, if not all, Manufacturing Defendants, including but not limited to 3M and Dupont, were aware that PFOA and/or PFOS were biopersistent when allowed to enter the environment unmitigated.

98.     By the end of the 1980's, certain, if not all, Manufacturing Defendants, including but not limited to 3M and Dupont, were aware that PFOA and PFOS bind to human and animal tissue, persist in human and animal bodies for years, and, accumulate in humans and animals that continue to be exposed.

99.     By the end of the 1980's, certain, if not all, Manufacturing Defendants, including but not limited to 3M and Dupont, were aware that PFOA and/or PFOS were detected throughout the world.

100.    Upon information and belief, by the end of the 1980's, certain Manufacturing Defendants, including, but not limited to, 3M and DuPont, learned that PFOA and PFOS had the potential to pass the placenta wall, impact a fetus, and/or cause birth defects in humans and animals.

101.    Upon information and belief, by the end of the 1980's, female 3M employees of childbearing potential who were exposed to PFAS during their employ were moved to new roles in 3M as a result of these studies.

102.    Upon information and belief, after the 1980's, certain Manufacturing Defendants, including 3M and Dupont, conducted additional studies that confirmed the biopersistent,

14

bioaccumulative, and toxic properties of PFOA and PFOS in humans and animals.

103.     Upon information and belief, studies conducted throughout the 1990's by certain Manufacturing Defendants, including 3M and Dupont, confirmed that exposure to PFOA and PFOS may cause various adverse human health impacts including an increased risk of cancer.

104.     Upon information and belief, in 1998, 3M, through an executive, told the EPA that 3M has no information suggesting that human health is at risk from exposure to PFOA and/or PFOS.

105.     Upon information and belief, from 1940 through at least 1998, the Manufacturing Defendants did not inform the appropriate governmental authorities, the public, or consumers of products containing PFOA and/or PFOS of the findings of the foregoing studies and other studies they completed.

106.     Upon information and belief, from 1940 through at least 1998, the Manufacturing Defendants did not inform or otherwise warn the appropriate governmental authorities, the public, or consumers of products containing PFOA and/or PFOS, that PFOA and/or PFOS may be a latent toxic substance.

107.     Upon information and belief, from 1940 through at least 1998, the Manufacturing Defendants did not inform or otherwise warn the appropriate governmental authorities, the public, or consumers of products containing PFOA and/or PFOS, that PFOA and/or PFOS may be biopersistent.

108.     Upon information and belief, from 1940 through at least 1998, the Manufacturing Defendants did not inform or otherwise warn the appropriate governmental authorities, the public, or consumers of products containing PFOA and/or PFOS, that PFOA and/or PFOS may be bioaccumulative.

15

109.    In 2000, EPA issued an internal memorandum discussing the adverse impacts of PFOA and PFOS to human health and the environment citing that the chemicals are biopersistent, bioaccumulative in animals and humans, toxic, and may pose a long term risk to human health and the environment.

110.    In and/or shortly before 2000, EPA pressured 3M to phase out and/or cease producing PFOA and PFOS.

111.    In 2000, 3M, in response to pressure from EPA, finally announced that it would phase out production of PFOA and PFOS.

112.    On May 16, 2000, the United States and 3M Company publicly announced an agreement to phaseout PFOS from production because "these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term." The press release went on to state "PFOS chemicals are used to produce a range of products from fire-fighting foams coatings for fabrics, leather, and some paper products, to industrial uses such as mist suppressants in acid baths."

113.    Despite the foregoing, in 2000, 3M issued a press release asserting that PFOA and PFOS are safe.

114.    In 2002, 3M substantially completed the phase out production of PFOA and PFOS.

115.    Despite 3M's substantial phase out of PFOA manufacturing, in 2002, DuPont opened a new manufacturing facility to take over manufacturing of PFOA and/or its precursors because production of those chemicals as well as products produced by DuPont that contained or were manufactured with the chemicals were so profitable.

116.    Upon information and belief, DuPont elected to open this facility to continue the

16

production of PFOA and its precursors despite having apparent knowledge of the foregoing information.

117.     DuPont, 3M and the other Manufacturing Defendants have been named defendants in hundreds, if not, thousands of personal injury, property damage and cost recovery lawsuits throughout the country for their egregious conduct.

## V.     **Manufacturers of AFFF**

118.     Upon information and belief, from at least the 1950's to 2002, Defendant 3M developed, designed, manufactured, marketed, sold and/or distributed PFOS, PFOA, their precursors and other applicable PFAS for use in, among other products, AFFF.

119.     Upon information and belief, 3M developed, designed, manufactured, marketed, sold and/or distributed AFFF Components to the AFFF Manufacturing Defendants for the AFFF Manufacturing Defendants' use as an ingredient in AFFF.

120.     Upon information and belief, Defendant 3M developed, designed, manufactured, marketed, sold and/or distributed AFFF containing PFOA, PFOS, and/or their precursors, as well as other PFAS beginning in the 1950's through approximately 2002.

121.     Each of the other AFFF Manufacturing Defendants developed, designed, manufactured, marketed, sold and/or distributed AFFF containing PFOA, PFOS, and/or their precursors as well as other PFAS for decades and during relevant times.

122.     Upon information and belief, the AFFF Manufacturing Defendants knew, or should have known, that PFOA, PFOS and/or their precursors, as well as other PFAS were contained in their AFFF products.

123.     Upon information and belief, during all relevant times, the Product Manufacturing Defendants developed, designed, manufactured, marketed, sold and/or distributed AFFF

17

Case 2:21-cv-03306-BMC   Document 1-3   Filed 06/11/21   Page 22 of 39 PageID #: 47

Components to the AFFF Manufacturing Defendants for the AFFF Manufacturing Defendants' use in the production of AFFF.

124.   Upon information and belief, the Product Manufacturing Defendants knew, or should have known, that the AFFF Components they produced, distributed and sold to the AFFF Manufacturing Defendants would cause AFFF to contain PFOA, PFOS, their precursors and other PFAS.

125.   Upon information and belief, the Defendants knew, or should have known, of the risks of PFOA, PFOS and other PFAS to human health and the environment when manufacturing, marketing, selling and distributing their products.

126.   Upon information and belief, the Defendants, despite having such knowledge, failed to timely inform the EPA, other applicable government agencies, or the public of the information they possessed related to risks to human health and the environment of AFFF containing PFOA, PFOS and/or their precursors as well as other PFAS and continued to manufacture, market, sell and distribute AFFF with such knowledge.

127.   Upon information and belief, the Defendants, despite having such knowledge, failed to adequately warn AFFF end-users, including the Town, of the potential hazards to human health and the environment and provide ways to mitigate such hazards by, for example: (i) excavating soil contacted with AFFF, or (ii) placing a containment liner down where AFFF was used for training/equipment testing, AFFF was stored or AFFF equipment was washed.

128.   Upon information and belief, the Defendants, despite having such knowledge, failed to adequately provide AFFF end-users, including the Town, with best management practices sufficiently designed to minimize health and environmental risks during all relevant times.

18

129.     While AFFF Manufacturing Defendants have changed their AFFF formulas, AFFF produced by AFFF Manufacturing Defendants containing PFOA/PFOS and/or their precursors, as well as other PFAS remains stored on shelves and may continue to be used into the foreseeable future.

130.     Upon information and belief, AFFF Manufacturing Defendants have not recalled their produced AFFF containing PFOA, PFOS, or their precursors that remains stored and/or on the shelves today.

131.     During all relevant times, reasonable and safer alternatives were available to produce AFFF, or an effective sister product, without PFOA, PFOS, their precursors, and/or certain other PFAS particularly for use in training operations and extinguishment of certain fires.

## VI.     Introduction of PFOA and PFOS to Environmental Media At the Airport

132.     PFOA, PFOS, their precursors and other PFAS are, or have been, contained in AFFF.

133.     AFFF has been used for decades to extinguish flammable liquid fires and for training.

134.     AFFF concentrate is mixed with water to make a liquid foam which is aerated and applied to fire suffocating the fire of oxygen and thereby extinguishing it.

135.     Upon AFFF being sprayed in accordance with its intended use and per AFFF Manufacturing Defendants' instructions, the AFFF material contacts the ground and PFOA, PFOS, other PFAS and/or their precursors enter the soil.

136.     The PFOA, PFOS, their precursors and other PFAS then migrate through the soil to the groundwater below causing PFAS contamination.

137.     AFFF has been stored and used at, among other places, airports throughout the

19

country, including the Town's Airport from approximately 1960 forward.

138.    AFFF Manufacturing Defendants designed, manufactured, distributed, marketed, supplied and/or sold AFFF used and stored at the Airport.

139.    Town purchased AFFF produced by certain of the Defendants, including but not limited to, Defendant 3M and Defendant Chemguard.

140.    Product Manufacturing Defendants designed, manufactured, distributed, marketed, supplied and/or sold AFFF Components that the AFFF Manufacturing Defendants used to make the AFFF that was used and/or stored at the Airport.

141.    Throughout the time AFFF containing PFOA, PFOS, PFAS, and/or their precursors was used and stored at the Airport, warning labels, manuals, and safety information provided with AFFF did not provide notification of the environmental and health perils of which the Manufacturing Defendants knew, or should have known, existed.

142.    Defendants failed to warn end users, including the Town, that unmitigated releases of AFFF were likely to cause environmental harm.

143.    Defendants failed to instruct end-users, including the Town to: (i) excavate soil that has come in contact with AFFF, or (ii) place a liner on the ground to prevent migration of contaminants before AFFF use or to contain leakage from storage or washing of equipment.

144.    AFFF was stored at the Airport and used for actual firefighting/crash response and firefighting training drills for decades.

145.    Use and storage of AFFF produced by the AFFF Manufacturing Defendants has caused contamination of environmental media, including soil and groundwater at and around the Airport.

146.    PFAS, including PFOA and PFOS, has been detected in soil and groundwater at

20

and around the Airport.

147.    As PFOA, PFOS and likely other PFAS at issue are biopersistent, it is expected

that the contaminated environmental media will remain contaminated for decades absent active

remediation.

## VII.    The Detection of PFAS in Environmental Media at and around the Airport

148.    Prior to May 2019, NYSDEC classified the Airport as a "P" site, meaning it is a

potential superfund site, due to suspected PFAS contamination resulting from suspected AFFF

use and storage.   Specifically, NYSDEC's Environmental Site Remediation Database for the

Airport states:

> No data for PFOA/PFOS is available from the Airport but sampling
> by the Suffolk County Water Authority in 2016 at Church Street
> Well # 13 in Bohemia found PFOS at a level of 95 ppt (exceeding
> the USEPA HAL of 70 ppt) and resulting in the Water Authority
> treating the raw water with granulated activated carbon. The source
> of this contamination is suspected to be firefighting foam used at
> MacArthur Airport. Based on this NYSDEC has requested that a site
> characterization be performed.

149.    After designating the Airport as a "P" site, NYSDEC demanded that Town enter

into an Order on Consent and Administrative Settlement to initially conduct and pay for the Site

Characterization of the Airport (the "Consent Order").   According to NYSDEC's website:

> The goal of the [Site Characterization] is to determine whether a site
> meets the state's definition of a hazardous waste site by confirming
> or denying the presence of hazardous waste and determining
> whether or not the site poses a significant threat to public health or
> the environment . . . If the presence of hazardous waste and the
> degree of health or environmental threat can be documented, a site
> is listed on the Registry of Inactive Hazardous Waste Disposal Sites
> (Registry).

150.    On May 28, 2019, Town entered into the Consent Order and is in the process of

21

conducting and paying for the Site Characterization under NYSDEC oversight and approval.

151.   The results of the Site Characterization of the Airport will allow NYSDEC to determine whether to classify the Airport on the Registry.  Specifically, NYSDEC will use the information resulting from the Site Characterization to determine whether "the disposal of hazardous waste has been confirmed [at the Airport] and the presence of such hazardous waste or its components or breakdown products represents a significant threat to public health or the environment."

152.   To date, the Town's ongoing Site Characterization has detected the following in subsurface environmental media at the Airport where AFFF was used: (i) PFOS and PFOA in groundwater many multiples above the 10 ppt MCLs, (ii) PFOS and PFOA in soil many multiples above NYSDEC's soil cleanup objectives for the protection of groundwater, and (iii) several other PFAS chemicals in soil and groundwater including, perfluorohexanesulfonic acid ("PFHxS"), which is a PFAS chemical also contained in AFFF.

153.   To the extent NYSDEC lists the Airport on the Registry, NYSDEC will demand that the Town, pursuant to the New York Environmental Conservation Law ("ECL") and applicable NYSDEC regulations, *inter alia*, conducts and pays for a Remedial Investigation (RI), Feasibility Study (FS) and remediation of the contamination at and emanating from the Airport under NYSDEC oversight, as well as reimburse NYSDEC's costs (past and future).

## VIII. The Town's Properties Are Significantly Depreciated Due to the Contamination

154.   The Town owns properties and/or is a tenant under long term leases for properties at and surrounding the Airport.

155.     The potential superfund site designation (and ultimate addition to the NYSDEC Registry, if it occurs) and the detected contamination renders the Town's properties (owned or leased) significantly depreciated due to liability concerns and stigma, among other reasons.

156.     Defendants acts and/or omissions have deprived or otherwise interfered with Town's possession or enjoyment of its properties, including the Airport.

## CAUSES OF ACTION

### First Cause of Action Against All Defendants
### (Negligence)

157.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

158.     Defendants owed a duty of care to Plaintiff to not design, develop, manufacture, distribute, market, supply, and sell AFFF and AFFF Components that were likely to contaminate environmental media at and around the Airport.

159.     Defendants breached their duties by negligently designing, developing, manufacturing, distributing, marketing, supplying, and/or selling AFFF and/or AFFF Components, which were used at and around the Airport.

160.     Alternatively, Defendants owed a duty of care to Plaintiff to immediately warn Plaintiff that the storage, use or washing of AFFF or AFFF equipment or otherwise failing to contain releases of AFFF were likely to latently contaminate environmental media, including soil and groundwater.

161.     Defendants breached their duties by failing to warn Plaintiff that the use and/or storage of AFFF was likely to latently contaminate environmental media at and around the Airport.

23

Case 2:21-cv-03306-BMC Document 1-3 Filed 06/11/21 Page 28 of 39 PageID #: 53

162.    Defendants' breaches are the actual cause or substantial factor of: (i) contamination of the environmental media at and around the Airport, (ii) endangerment to the environment and human health described herein, and (iii) damages suffered by Plaintiff set forth herein.

163.    Defendants' breaches are the proximate cause of: (i) contamination of the environmental media at and around the Airport, (ii) endangerment to the environment and human health described herein, and (iii) damages suffered by Plaintiff set forth herein.

164.    Upon information and belief, Defendants knew or should have known that their acts were probable to cause injury to the environment and human health in the manner complained herein.  Defendants acted with knowledge, intent, fraud and/or malice driven by their own motives to profit from their products with conscious disregard for public health and the environment.

165.    As a result of the foregoing, Defendants are jointly and severally liable to the Plaintiff in an amount to be proven at trial for: (I) actual, direct, indirect, incidental and consequential compensatory damages for diminution of the value of Plaintiff's properties and other past and future damage, including Plaintiff's costs associated with investigating and remediating impacted environmental media at and around the Airport; (II) natural resource damages for damage to the environmental media located at and around the Airport; (III) injunctive relief requiring and directing Defendants to restore, or otherwise pay for the restoration of, all environmental media at and around the Airport, and (IV) for such other, further, and different relief as the Court deems just and proper including punitive damages, pre- and post- judgment interest, costs, and attorneys' fees.

### Second Cause of Action Against All Defendants
**(Strict Liability - Ultra Hazardous Activity)**

166.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding

24

Case 2:21-cv-03306-BMC  Document 1-3  Filed 06/11/21  Page 29 of 39 PageID #: 54

paragraphs as if fully stated herein.

167.     Defendants' design, development, manufacturing, distribution, marketing, supply, and sale of AFFF Components and AFFF, which was used at and around the Airport, in an unremediated, unmonitored, unreported and unsecured condition constitutes ultrahazardous activity.

168.     Defendants' design, development, manufacturing, distribution, marketing, supply, and sale of AFFF Components and AFFF: (i) created a high risk of harm to others, including the Town, (ii) created a likelihood that the harm resulting from these activities would be great, (iii) presented the inability to eliminate the risk by the exercise of reasonable care, (iv) were not a matter of common usage as such products contained dangerous latent chemicals, (v) were inappropriate to the place carried on at and around the Airport, which overlies a sole source aquifer, and/or (vi) the value to the community did not outweigh its dangerous attributes.

169.     As a result of these ultrahazardous activities, Defendants have and had a duty, including an absolute duty to Plaintiff.

170.     As a result of these ultrahazardous activities, PFOA, PFOS and other PFAS were released into the environment at and around the Airport causing harm to Plaintiff and the environment.

171.     Each Defendant's conduct actually caused and/or was a substantial factor in causing: (i) contamination of the environmental media at and around the Airport, (ii) endangerment to the environment and human health described herein, and (iii) damages suffered by Plaintiff set forth herein.

172.     Each Defendant's conduct is the proximate cause of the: (i) contamination of the environmental media at and around the Airport, (ii) endangerment to the environment and human

25

Case 2:21-cv-03306-BMC   Document 1-3   Filed 06/11/21   Page 30 of 39 PageID #: 55

health described herein, and (iii) damages suffered by Plaintiff set forth herein.

173.    The harm suffered by Plaintiff is precisely the kind of harm that made the Defendants' activities ultrahazardous.

174.    Upon information and belief, Defendants knew or should have known that their design, development, manufacturing, distribution, marketing, supply, sale and/or failure to warn were probable to cause injury to the environment and human health in the manner complained herein.  Defendants acted with knowledge, intent, fraud and/or malice driven by their own motives to profit from their products with conscious disregard for public health and the environment.

175.    As a result of the foregoing, Defendants are jointly and severally liable to the Plaintiff in an amount to be proven at trial for: (I) actual, direct, indirect, incidental and consequential compensatory damages for diminution of the value of Plaintiff's properties and other past and future damage, including Plaintiff's costs associated with investigating and remediating impacted environmental media at and around the Airport; (II) natural resource damages for damage to the environmental media located at and around the Airport; (III) injunctive relief requiring and directing Defendants to restore, or otherwise pay for the restoration of, all environmental media at and around the Airport, and (IV) for such other, further, and different relief as the Court deems just and proper including punitive damages, pre- and post- judgment interest, costs, and attorneys' fees.

**Third Cause of Action Against All Defendants**
**(Strict Liability - Defective Design)**

176.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

177.    Defendants designed, manufactured, distributed, marketed, supplied and/or sold

26

AFFF Components and/or AFFF that was used and stored at the Airport.

178.    Defendants placed such products into the stream of commerce.

179.    During all relevant times, AFFF presented latent dangers such that a reasonable consumer, purchaser or end-user, including the Town, would not be aware of such dangers.

180.    AFFF was not reasonably safe in its design.

181.    Feasible and safer alternatives to AFFF containing PFOA, PFOS, their precursors and certain PFAS existed during relevant times including for the uses that occurred at the Airport.

182.    Defendants failed to adopt these alternative designs.

183.    AFFF was used in accordance with the foreseeable and intended uses at and around the Airport.  AFFF use and storage is the actual cause or substantial factor of: (i) contamination of the environmental media at and around the Airport, (ii) endangerment to the environment and human health described herein, and (iii) damages suffered by Plaintiff set forth herein.

184.    AFFF was used in accordance with their foreseeable or intended uses at and around the Airport and is the proximate cause of: (i) contamination of the environmental media at and around the Airport, (ii) endangerment to the environment and human health described herein, and (iii) damages suffered by Plaintiff set forth herein.

185.    Upon information and belief, Defendants knew or should have known that their products would cause injury to the environment and human health in the manner complained herein.  Defendants acted with knowledge, intent, fraud and/or malice driven by their own motives to profit from their products with conscious disregard for public health and the environment.

186.    As a result of the foregoing, Defendants are jointly and severally liable to the Plaintiff in an amount to be proven at trial for: (I) actual, direct, indirect, incidental and consequential compensatory damages for diminution of the value of Plaintiff's properties and

27

other past and future damage, including Plaintiff's costs associated with investigating and remediating impacted environmental media at and around the Airport; (II) natural resource damages for damage to the environmental media located at and around the Airport; (III) injunctive relief requiring and directing Defendants to restore, or otherwise pay for the restoration of, all environmental media at and around the Airport, and (IV) for such other, further, and different relief as the Court deems just and proper including punitive damages, pre- and post- judgment interest, costs, and attorneys' fees.

### Fourth Cause of Action Against All Defendants
### (Strict Products Liability - Failure to Warn)

187.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

188.    Defendants were designers, manufacturers, distributers, marketers, suppliers, and/or sellers of AFFF Components and AFFF that was used and stored at the Airport.

189.    Defendants had a duty to warn against latent dangers resulting from the intended or foreseeable uses of their products that Defendant knew or should have known existed.

190.    The intended or foreseeable uses of AFFF presented latent dangers.

191.    Defendants knew or should have known of these latent dangers.

192.    Defendants failed to warn users of the latent dangers associated with AFFF, including those who used and stored such products at and around the Airport.

193.    Defendants' failure to warn is the actual cause or substantial factor of: (i) contamination of the environmental media at and around the Airport, (ii) endangerment to the environment and human health described herein, and (iii) damages suffered by Plaintiff set forth herein.

28

194.     Defendants' failure to warn is the proximate cause of: (i) contamination of the environmental media at and around the Airport, (ii) endangerment to the environment and human health described herein, and (iii) damages suffered by Plaintiff set forth herein.

195.     Upon information and belief, Defendants knew or should have known that their failure to warn would cause injury to the environment and human health in the manner complained herein.  Manufacturing Defendants acted with knowledge, intent, fraud and/or malice driven by their own motives to profit from their products with conscious disregard for public health and the environment.

196.     As a result of the foregoing, Defendants are jointly and severally liable to the Plaintiff in an amount to be proven at trial for: (I) actual, direct, indirect, incidental and consequential compensatory damages for diminution of the value of Plaintiff's properties and other past and future damage, including Plaintiff's costs associated with investigating and remediating impacted environmental media at and around the Airport; (II) natural resource damages for damage to the environmental media located at and around the Airport; (III) injunctive relief requiring and directing Defendants to restore, or otherwise pay for the restoration of, all environmental media at and around the Airport, and (IV) for such other, further, and different relief as the Court deems just and proper including punitive damages, pre- and post- judgment interest, costs, and attorneys' fees.

## Fifth Cause of Action Against All Defendants
### (Public Nuisance)

197.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

198.     The Town's properties, including the Airport and the groundwater, which are now

29

FILED: SUFFOLK COUNTY CLERK 05/10/2021 03:12 PM INDEX NO. 608716/2021

NYSCEF DOC. NO. 1 Case 2:21-cv-03306-BMC Document 1-3 Filed 06/11/21 Page 34 of 39 PageID #: 59 RECEIVED NYSCEF: 05/10/2021

contaminated, benefit the public.

199.    The negligent, reckless, and/or intentional activity of the Defendants, as alleged herein, has created, contributed to, caused and/or maintained contamination of the environmental media at and around the Airport.

200.    The contamination of the environmental media created, contributed and/or maintained by Defendants constitutes a substantial interference with a right common to the public that offends public morals, interferes with or causes damage to the public's right to use the groundwater and other environmental media, and/or endangers or injures the property, health, safety or comfort of the Town.

201.    Upon information and belief, Defendants knew or should have known that their design, development, manufacturing, distribution, marketing, supply, sale and/or failure to warn were probable to cause injury to the environment, property, and human health in the manner complained herein.  Defendants acted with knowledge, intent, fraud and/or malice driven by their own motives to profit from their products with conscious disregard for public health and the environment.

202.    Each Defendant is a substantial factor in bringing about the contamination of the environmental media at and around the Airport, and each Defendant is jointly responsible for the injuries and damage caused to Plaintiff.

203.    As a result of the foregoing, Defendants are jointly and severally liable to the Plaintiff in an amount to be proven at trial for: (I) actual, direct, indirect, incidental and consequential compensatory damages for diminution of the value of Plaintiff's properties and other past and future damage, including Plaintiff's costs associated with investigating and remediating impacted environmental media at and around the Airport; (II) natural resource

30

FILED: SUFFOLK COUNTY CLERK 05/10/2021 03:12 PM    INDEX NO. 608716/2021

NYSCEF DOC. NO.: ... Case 2:21-cv-03306-BMC    Document 1-3    Filed 06/11/21    Page 35 of 39 PageID #: 60    RECEIVED NYSCEF: 05/10/2021

damages for damage to the environmental media located at and around the Airport; (III) injunctive relief requiring and directing Defendants to restore, or otherwise pay for the restoration of, all environmental media at and around the Airport, and (IV) for such other, further, and different relief as the Court deems just and proper including punitive damages, pre- and post- judgment interest, costs, and attorneys' fees.

### Sixth Cause of Action Against All Defendants
### (Trespass)

204.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

205.    Plaintiff did not give Defendants authority to cause PFOA, PFOS or other PFAS to enter the environmental media on property it owns at and around the Airport.

206.    Upon information and belief, Defendants knew or should have known that their design, development, manufacturing, distribution, marketing, supply, sale, and/or failure to warn were probable to cause such contamination of environmental media at and around the Airport and otherwise result in the Airport being designated as a potential superfund site.

207.    Defendants' willful conduct resulted in PFOA, PFOS and other PFAS intruding into environmental media at and around the Airport without authorization.

208.    Defendants' actions or omissions are the actual cause or substantial factor of: (i) contamination of the environmental media at and around the Airport, (ii) endangerment to the environment and human health described herein, and (iii) damages suffered by Plaintiff set forth herein.

209.    Defendants' actions or omissions are the proximate cause of: (i) contamination of the environmental media at and around the Airport, (ii) endangerment to the environment and

31

human health described herein, and (iii) damages suffered by Plaintiff set forth herein.

210. Upon information and belief, Defendants knew or should have known that their design, development, manufacturing, distribution, marketing, supply, sale and/or failure to warn were probable to cause injury to the environment and human health in the manner complained herein. Defendants acted with knowledge, intent, fraud and/or malice driven by their own motives to profit from their products with conscious disregard for public health and the environment.

211. As a result of the foregoing, Defendants are jointly and severally liable to the Plaintiff in an amount to be proven at trial for: (I) actual, direct, indirect, incidental and consequential compensatory damages for diminution of the value of Plaintiff's properties and other past and future damage, including Plaintiff's costs associated with investigating and remediating impacted environmental media at and around the Airport; (II) natural resource damages for damage to the environmental media located at and around the Airport; (III) injunctive relief requiring and directing Defendants to restore, or otherwise pay for the restoration of, all environmental media at and around the Airport, and (IV) for such other, further, and different relief as the Court deems just and proper including punitive damages, pre- and post- judgment interest, costs, and attorneys' fees.

### Seventh Cause of Action Against All Defendants
### (Restitution/Unjust Enrichment)

212. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

213. Manufacturing Defendants made millions, if not billions, in profit from design, development, manufacturing, distribution, marketing, supply, and sale, of AFFF Components and AFFF.

32

214.    PFOA, PFOS and other PFAS have contaminated environmental media at and around the Airport.

215.    It would be against equity and good conscience to permit Defendants to pass to Plaintiff the financial burden of: (i) diminution of Plaintiff's properties and other past and future damage, and (ii) investigating and remediating contamination at and emanating from the Airport as a result of Defendants' actions.

216.    Defendants must make restitution to Plaintiff for all of Plaintiff's prior, current and future associated expenses, costs and damages, including interest, attorneys' fees and costs.

## Eighth Cause of Action Against All Defendants
### (Contribution)

217.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

218.    NYSDEC is requiring Town to investigate and remediate the contamination at and around the Airport, or otherwise reimburse New York State for such costs.

219.    Defendants owed a duty of care to the State of New York not to design, develop, manufacture, distribute, market, supply, and/or sell AFFF Components or AFFF for use/storage at the Airport that was likely to contaminate environmental media at and around the Airport.

220.    Defendants breached their duties by designing, developing, manufacturing, distributing, marketing, suppling, and/or selling AFFF Components or AFFF for use at the Airport and failing to provide proper warnings to end-users.

221.    Defendants' breaches actually caused, had a part in causing, were a substantial factor in causing, contributed to, and/or proximately caused the PFOA, PFOS and other PFAS contamination found at and around the Airport and the designation of the Airport as a potential

33

superfund site.

222.    To the extent Plaintiff is found liable to NYSDEC or New York State, or otherwise receives a demand by New York State to reimburse the State for its costs, or conduct/pay for an investigation or remediation of such contamination, Defendants shall be deemed liable in an amount to be proven at trial for their apportionment of fault.

**WHEREFORE,** plaintiff Town of Islip, New York requests judgment in its favor and against Defendants as follows:

i.    Actual, direct, indirect, incidental and consequential compensatory damages, in an amount to be proven at trial, for diminution of the value of Plaintiff's properties and other past and future damage, including Plaintiff's costs associated with, among other things, investigating and remediating contamination at and emanating from the Airport and surrounding properties;

ii.    Natural resource damages, in an amount to be proven at trial, for damage to the environmental media located at and around the Airport and surrounding properties;

iii.    To the extent money damages are inadequate, injunctive relief requiring and directing Defendants to restore, or otherwise pay for the restoration of, all environmental media at and around the Airport and surrounding properties;

iv.    All appropriate declaratory relief;

v.    Against Defendants to the extent Plaintiff is found liable to New York State or NYSDEC, or otherwise receives, or has received, a demand from the State (including NYSDEC and/or the New York State Department of Health) for reimbursement of the State's cost or to conduct/pay for an investigation or remediation of such contamination, for contribution of such award;

vi.    Awarding punitive damages in a sum to be determined at trial;

34

Case 2:21-cv-03306-BMC   Document 1-3   Filed 06/11/21   Page 39 of 39 PageID #: 64

vii.     Awarding pre- and post-judgment interest, with costs and disbursements

viii.    Awarding attorneys' fees related to the prosecution of the instant action, and

ix.      Awarding such other, further and different relief as the Court deems just and

proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Dated:  May 10, 2021
         Melville, New York

                              Respectfully submitted,

                              **RIGANO LLC**
                              *Attorneys for Town of Islip, New York*

                              By: */s/ Nicholas C. Rigano*
                                  James P. Rigano, Esq.
                                  Nicholas C. Rigano, Esq.
                                  538 Broad Hollow Road, Suite 301
                                  Melville, New York 11747
                                  (631) 756-5900
                                  nrigano@riganollc.com

35